# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

MCFS & BB, INC., et al.,

      Plaintiffs,

vs.                         Case No.  3:21-cv-254-MMH-MCR

HARTFORD INSURANCE
COMPANY OF THE SOUTHEAST,

      Defendant.

_____/

# O R D E R

**THIS CAUSE** is before the Court on two Daubert[1] motions, one filed by Defendant Hartford Insurance Company of the Southeast (Defendant) and one filed by Plaintiffs MCFS & BB, Inc.; Peter E. Petersen, individually and as trustee of the Peter E. Petersen Revocable Living Trust; and Mary Carter Petersen, individually and as trustee of the Mary F. Carter Revocable Living Trust (Plaintiffs).  See Defendant, Hartford Insurance Company of the Southeast's Motion to Strike Expert Testimony of Plaintiff's [sic] Expert Witness Timothy P. Marshall Under Daubert Standard and Memorandum of Law in Support Thereof (Doc. 35; Defendant's Motion), filed January 21, 2022; Plaintiffs' Daubert Motion in Limine to Exclude Portions of Expert Testimony

---

[1] See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

of Kenneth R. Quigley and Incorporated Memorandum of Law (Doc. 36; Plaintiffs' Motion), filed January 21, 2022. Plaintiffs and Defendant timely filed responses to the motions. <u>See</u> Plaintiffs' Motion in Opposition to Defendant's <u>Daubert</u> Motion to Exclude Testimony of Timothy P. Marshall (Doc. 39; Plaintiffs' Response), filed February 11, 2022; Defendant's Motion in Opposition to Plaintiffs' <u>Daubert</u> Motion (Doc. 38; Defendant's Response), filed February 8, 2022. Accordingly, these matters are ripe for review.

## I.    Background[2]

Plaintiffs initiated this action on February 1, 2021, by filing a Complaint (Doc. 3; Complaint) in the Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida. Defendant removed the case to the Middle District of Florida on March 11, 2021. <u>See</u> Defendant Hartford Insurance Company of the Southeast's Petition for Removal (Doc. 1). In the Complaint, Plaintiffs allege that the individual Plaintiffs, Peter E. Petersen and Mary Carter Petersen, own a commercial building in Jacksonville Beach, Florida (the "Building"). <u>See</u> Complaint ¶¶ 4–6. Plaintiff Mary Carter Petersen owns Plaintiff MCFS & BB, Inc., which operates out of the Building. <u>See</u> <u>id.</u> ¶ 7. Plaintiffs allege that the Building suffered physical damage in 2020 and that the physical damage

---

[2] The Court's citations to page numbers in documents in the record refer to the CM-ECF-stamped page numbers located at the top of each page, rather than a document's internal page numbers, if any.

allowed rain to enter, causing further loss. See id. ¶¶ 9–13. Plaintiffs assert that Defendant issued a commercial property insurance policy for the Building but breached its contractual obligation under the policy by refusing to pay Plaintiffs' damages. See id. ¶¶ 4, 15–17. Defendant's insurance policy does not cover damage caused by rain unless the Building first sustained "physical damage by a Covered Cause of Loss to its roof or walls through which the rain" entered. Complaint, Ex. A at 40. Plaintiffs' theory of the case is that wind (a covered cause of loss) created openings in the Building through which water entered, causing the subject damages. See Plaintiffs' Motion at 2.

On January 21, 2022, Defendant filed a Daubert motion seeking to exclude the testimony of Plaintiffs' witness Timothy P. Marshall. See Defendant's Motion at 1. Marshall is a meteorologist and engineer with an M.S. in atmospheric science, an M.S. in civil engineering, and over forty years of experience. See Defendant's Motion, Ex. A: Plaintiffs' Rule 26 Rebuttal Expert Disclosure (Doc. 35-1; Marshall Report) at 32. Plaintiffs identified and disclosed Marshall as a rebuttal expert and asserted that he would testify "regarding meteorological conditions that occurred within the proximity of the subject building that were capable of causing or contributing to the damages to the property. Additionally, he will explain the impact these meteorological events have on buildings." Id. at 2. Marshall conducted a meteorological study of wind and rainfall events that occurred near the Building from January 2019 through

June 2020. Id. at 5. Based on official weather data gathered from Craig Airport, Marshall concluded that the highest winds at the Building during the study's timeframe occurred on September 4, 2019, and February 6, 2020. See id. at 10–11. At his deposition, Marshall testified that these wind events were "reasonably capable" of causing damage to a commercial building. See Plaintiffs' Response, Ex. C: Deposition of Timothy P. Marshall, P.E. (Doc. 39-3; Marshall Dep.) at 43–44. Defendant seeks to exclude Marshall's testimony. See generally Defendant's Motion.

Plaintiffs also filed a Daubert motion in which they seek to exclude the testimony of Defendant's expert Kenneth R. Quigley "regarding causation of damages, or that water intrusion was caused by construction defects and inadequate prior repairs to the property." Plaintiffs' Motion at 15. Quigley is a structural engineer with an M.S. in civil engineering and over forty years of experience. See Plaintiffs' Motion, Ex. 1: Report of Kenneth R. Quigley (Doc. 36-1; Quigley Report) at 33–38. Defendant retained Quigley to "determine, based on this information [Plaintiffs' production], whether damages were caused by water entering the building through hole(s) created in the building by wind forces and/or windblown debris." Id. at 1. Quigley concluded that "there has been historic water intrusion at this building and that water intrusion at this building was due to problems with the construction of the building, including previous repairs, and was not due to wind caused openings

in the building allowing water intrusion." Id.  Plaintiffs seek to exclude Quigley's opinion that construction defects caused the water damage to the Building.  See Plaintiffs' Motion at 15.

## II.  Legal Standard

Rule 702 of the Federal Rules of Evidence (Evidence Rule(s)) provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Evidence Rule 702.[3]  In Daubert, the Supreme Court explained that Evidence Rule 702 imposes an obligation on a trial court to act as gatekeeper, to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). The trial court must exercise "the same gatekeeping function" when "considering the admissibility of technical expert evidence."  United States v.

---

[3] The language of Evidence Rule 702 was amended in December 2011.  The Advisory Committee Notes accompanying this latest revision state that the changes are only stylistic and do not make any substantive change.  Evidence Rule 702 advisory committee's note (2011 amends.).  Thus, case law interpreting and applying Evidence Rule 702 prior to the 2011 changes is still applicable.

Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).  To determine the

admissibility of expert testimony, a trial court must consider if:

> (1) the expert is qualified to testify competently regarding the
> matters he intends to address; (2) the methodology by which the
> expert reaches his conclusions is sufficiently reliable as determined
> by the sort of inquiry mandated in Daubert; and (3) the testimony
> assists the trier of fact through the application of scientific,
> technical, or specialized expertise, to understand the evidence or to
> determine a fact in issue.

Id.  The burden of establishing qualification, reliability, and helpfulness lies

with the party offering the expert opinion.  See McClain v. Metabolife Int'l, Inc.

401 F.3d 1233, 1238 (11th Cir. 2005).

For the purpose of conducting the reliability inquiry mandated by

Daubert, the Supreme Court has suggested that a trial court consider a number

of factors, which include: (1) whether the theory or technique can be, and has

been, tested; (2) whether the theory or technique has been subjected to peer

review and publication; (3) the known or potential rate of error; and (4) whether

the theory has attained general acceptance in the relevant scientific

community.  See Daubert, 509 U.S. at 593–94.  These factors are not exhaustive,

and the Eleventh Circuit Court of Appeals has also considered whether an

expert has relied on anecdotal evidence, such as case reports; temporal

proximity; and improper extrapolation.  See Allison v. McGhan Med. Corp., 184

F.3d 1300, 1312 (11th Cir. 1999).  When evaluating non-scientific, experience-

based testimony, the Eleventh Circuit recognizes that "[s]ometimes the specific

<u>Daubert</u> factors will aid in determining reliability; sometimes other questions may be more useful." <u>Frazier</u>, 387 F.3d at 1262.  Indeed, while a trial court must always evaluate the reliability of expert testimony before allowing its admission at trial, "[e]xactly <u>how</u> reliability is evaluated may vary from case to case." <u>Id.</u>  Significantly, where an expert relies solely or primarily on experience to establish the reliability of his opinion, the expert "must explain <u>how</u> that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." <u>Id.</u> at 1261, 1265 (quoting Evidence Rule 702 advisory committee's note (2000 amends.)).  To fulfill its gatekeeping function, the Court must do more than "simply tak[e] the expert's word for it." <u>Id.</u> at 1262 (quoting Evidence Rule 702 advisory committee's note (2000 amends.)).  The Court's inquiry under Evidence Rule 702 must focus on the methodology, not conclusions, but the Court is not required to admit opinion testimony only connected to existing data by an expert's unsupported assertion.  See <u>Daubert</u>, 509 U.S. at 595; <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).

The proponent of expert testimony need not show that the opinion proffered is scientifically correct, but only, based upon a preponderance of the evidence, that the opinion is reliable.  See <u>Allison</u>, 184 F.3d at 1312.  Thus, absolute certainty is not required.  See <u>Jones v. Otis Elevator Co.</u>, 861 F.2d 655, 662 (11th Cir. 1988).  However, an expert must know "facts which enable him

to express a reasonably accurate conclusion instead of mere conjecture or speculation," id., and an expert's assurances that he has used generally accepted scientific methodology are insufficient, McClain, 401 F.3d at 1244.

In addition to determining the reliability of the proposed testimony, Daubert instructs that Evidence Rule 702 requires a court to determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue. See Daubert 509 U.S. at 591. This consideration focuses on the relevance of the proffered expert testimony or evidence. The Supreme Court has explained that to satisfy this relevance requirement, the expert testimony must "fit," that is, it must be "relevant to the task at hand." Id. at 591, 597. In other words, it must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). Because scientific testimony does not assist the trier of fact unless it has a justified scientific relation to the facts, the Eleventh Circuit has instructed that "there is no fit where a large analytical leap must be made between the facts and the opinion." McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing Joiner, 522 U.S. at 143–46) (finding too great an analytical gap between data suggesting that one type of cancer was caused in mice and the conclusion or opinion that such data established causation of another type of cancer in humans)). Expert testimony also must "concern[] matters that are beyond the

understanding of the average lay person." <u>Frazier</u>, 387 F.3d at 1262.  The Eleventh Circuit has observed that "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Id.</u> at 1262–63.

## III.   Discussion

### A.   Marshall

Defendant argues that the Court should exclude Marshall's testimony because Plaintiffs improperly disclosed him as a rebuttal expert, his methodology is not reliable, and his testimony would not assist the jury.[4]  <u>See</u> Defendant's Motion at 4–10.  Having thoroughly reviewed the arguments, the evidence of record, and the applicable law, the Court finds that Plaintiffs properly identified Marshall as a rebuttal witness, that he used a reliable methodology to reach the opinions stated in his report, and that those opinions will assist the jury.  However, the Court will preclude Marshall from testifying that storms were "reasonably capable" of damaging the Building.

### 1.   Disclosure as a Rebuttal Witness

In a perfunctory manner, Defendant argues that Marshall is not a proper rebuttal witness because he did not state that he had evaluated or analyzed any

---

[4] Defendant does not contest Marshall's qualifications as a meteorologist.  The Court finds that Marshall is well-qualified to render his meteorological opinions by virtue of his education, training, and over forty years of experience.  <u>See</u> Marshall Report at 32–37 (Marshall's resume).

opinion of Defendant's experts.  See id. at 10.  In opposition, Plaintiffs contend that Marshall is a rebuttal expert because Defendant's expert Quigley analyzed weather conditions and asserted that "58 and 51 miles per hour gusts are well below hurricane force winds and normally do not physically damage sound, well maintained, buildings."  Plaintiffs' Response at 14 (quoting Quigley Report at 18).  Plaintiffs assert that Marshall responds to this "very opinion."  Id. at 15–16.

Under Rule 26 of the Federal Rules of Civil Procedure (Rule(s)), a rebuttal expert witness is one whose opinion is "intended solely to contradict or rebut evidence on the same subject matter identified by another party."  Rule 26 (a)(2)(D)(ii).  Here, the Court finds that Plaintiffs intended Marshall to rebut Quigley's discussion of weather data.  On at least one point, Marshall's conclusion differs from Quigley's opinion.  Quigley reported that the wind on February 6, 2020, came from the west.  See Quigley Report at 18.  But Marshall found that the wind came from the southwest.  See Marshall Report at 9.  In addition, Defendant provides no authority for its apparent proposition that, because Marshall generally agreed with Quigley, Plaintiffs improperly designated Marshall as a rebuttal witness.  This situation is unlike cases where courts have excluded so-called "rebuttal" experts because those experts improperly sought to supplement the opinion of a previously disclosed expert or to add new theories or damages to the plaintiff's case.  See Flamingo S. Beach I

Condo. Ass'n, Inc. v. Selective Ins. Co. of Se., 492 F. App'x 16, 25 (11th Cir. 2012) ("Plaintiff's late addition of Basulto was in reality an effort to substitute Basulto as Plaintiff's expert witness in place of Perez.");[5] Kroll v. Carnival Corp., No. 19-23017-CIV, 2020 WL 4793444, at *5–6 (S.D. Fla. Aug. 17, 2020) ("It is also clear that Dr. Suite's report is an attempt to add new theories and damages.").[6] Thus, the Court declines to find that Plaintiffs acted improperly by disclosing Marshall as a rebuttal witness.

### 2.   Methodology

Defendant raises two arguments challenging the reliability of Marshall's methodology.  First, Defendant argues that Marshall's testimony does nothing more than serve as a conduit for introducing arguably inadmissible hearsay weather reports.  See Defendant's Motion at 4–5.  Second, Defendant contests Marshall's conclusion that the wind conditions at the Plaintiffs' Building were similar to the wind conditions at Craig Airport, the source of the weather data.  See id. at 5.  Defendant contends that this opinion is unreliable because Marshall did not visit the Building or Craig Airport or conduct tests to

---

[5] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point.  See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[6] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority.  See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

determine whether the wind conditions at the two locations were similar.  <u>See</u> <u>id.</u> at 5–6.

In response, Plaintiffs argue that Marshall properly analyzed the available weather data to form his opinions about weather conditions at Plaintiffs' Building.  <u>See</u> Plaintiffs' Response at 7.  Plaintiffs explain that other experts in the field rely on these official weather records, such that Marshall's use of them is permissible under Evidence Rule 703.  <u>See</u> <u>id.</u> at 7–8.  According to Plaintiffs, Marshall used this data to deduce "that the identified squall line in proximity to the Property was capable of producing wind and rain that could damage the building."  <u>Id.</u> at 8–9.  Plaintiffs also maintain that Marshall adequately explained why he believed that conditions at Craig Airport and the Building were similar.  <u>See</u> <u>id.</u> at 9–10.  Plaintiffs point out that Defendant's expert, Quigley, relied on similar weather data from Jacksonville International Airport without performing tests to compare conditions at the airport and the Building.  <u>See</u> <u>id.</u>

After considering Marshall's report and deposition, the Court concludes that Marshall employed a sufficiently reliable methodology.  Marshall testified that he relied on documentation that is "official record" and that Defendant's expert Quigley relied on similar data.  <u>See</u> Marshall Dep. at 17; <u>see also</u> Quigley Report at 2; <u>SFR Servs. LLC v. Elec. Ins. Co.</u>, No. 8:19-CV-2013-CPT, 2021 WL 1193284, at *9 (M.D. Fla. Mar. 30, 2021) ("EIC does not contest Butler's use of

the NOAA data, nor could it, since its own experts relied on similar data in reaching their respective conclusions."). Evidence Rule 703 expressly allows experts to consider otherwise inadmissible evidence "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Evidence Rule 703. Marshall then reviewed the meteorological data, compared the Building's location to the source of the weather data, and formed an opinion about what weather events occurred at the Building. See Marshall Report at 10–11. Other courts have found similar methodologies to be reliable. See Incardone v. Royal Carribean Cruises, Ltd., No. 16-20924-CIV, 2018 WL 6520934, at *13 (S.D. Fla. Dec. 11, 2018) ("Nolan's report demonstrates that he relied on graphical ocean weather forecasts from NOAA . . . . Nolan used a reliable methodology and his permissible opinions meet the Daubert threshold." (citations omitted)), report and recommendation adopted, No. 16-20924-CIV, 2019 WL 8989848 (S.D. Fla. June 5, 2019); Bellina v. Liberty Mut. Ins. Co., No. CV 19-13711, 2021 WL 1295018, at *10 (E.D. La. Apr. 7, 2021) ("Other courts have found a similar review and synthesis of meteorological materials, by a qualified meteorological expert, a reliable method of concluding whether there was a hailstorm on a given date.").

In addition, the Court finds that Marshall provided a reliable explanation for his opinion that the weather events reported at Craig Airport did occur at the Building. Marshall explained that the weather observations at Craig

Airport were taken at the same height as the Building.  See Marshall Report at 10.  Marshall also considered the differences in the terrain at Craig Airport and at the Building and explained why these differences would likely offset each other.  See id.; see also Arlington S. Hills, LLC v. Am. Ins. Co., 51 F. Supp. 3d 681, 688–89 (N.D. Tex. 2014) (allowing an expert witness to rely on weather reports from nearby locations to offer an opinion about the weather conditions at the subject location).  The Court finds that the methodology is consistent with that used by other experts in the field and is sufficiently reliable to be admitted.[7] Although exclusion of the testimony is inappropriate, Defendant may cross-examine Marshall concerning any perceived deficiencies in his analysis.  See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341, 1345 (11th Cir. 2003) ("The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination."); Incardone, 2018 WL 6520934, at *13.

### 3.    Assistance to the Jury

Defendant argues that the Court should not admit Marshall's testimony because it would not assist the jury.  Defendant first contends that Marshall's

---

[7] Defendant's closing salvo of objections to Marshall's methodology is likewise unpersuasive.  Defendant asserts that Marshall "offers no opinions on why the weather occurred; the manners in which weather data could deviate from the recording instrument; [and] the deviations in intensity weather events can have from the proximity of the recording instrument." Defendant's Motion at 6.  To the extent these issues are relevant, they go to the weight of Marshall's opinion, not to the reliability of his methodology.

testimony is unhelpful because it is unreliable.  <u>See</u> Defendant's Motion at 7.
Next, Defendant asserts that Marshall's testimony would invite the jury to
commit a logical fallacy that, because a storm occurred at Plaintiffs' Building
and Plaintiffs later discovered damage, the storm must have caused the
damage.  <u>See</u> <u>id.</u>  Finally, Defendant argues that Marshall's conclusion would
not be helpful to the jury because he will not testify that a storm actually
damaged the Building.  <u>See</u> <u>id.</u> at 9–10.

Plaintiffs respond by clarifying the scope of Marshall's opinion: "Mr.
Marshall is not being offered to provide an opinion as to actual causation of
damage to the Property."  Plaintiffs' Response at 3.  Rather, Plaintiffs maintain
that Marshall's opinion assists the jury by providing the incremental piece of
evidence that storms occurred that could have caused the damage alleged by
Plaintiffs.  <u>See</u> <u>id.</u> at 12.  Plaintiffs contend that Marshall's testimony also will
assist the jury in understanding what weather conditions must occur in order
for wind to damage a commercial building.  <u>Id.</u> at 13.  Plaintiffs argue that an
ordinary juror does not understand how different weather events specifically
affect commercial buildings.  <u>See</u> <u>id.</u> at 13–14.

Here, Defendant's first argument is unavailing because the Court has
determined that Marshall's opinion is sufficiently reliable.  The Court also
rejects Defendant's second argument because, in his report, Marshall limited
his opinion to reporting the weather that occurred and the general effects of

wind on a commercial building.  See Marshall Report at 10–11.  This carefully worded opinion is unlikely to lead the jury into a logical fallacy.  And, contrary to Defendant's third argument, the Court finds that Marshall's limited opinion will assist the jury.  To prove that wind damaged the Building, Plaintiffs must show that high winds occurred.  Marshall could assist the jury by interpreting weather data and testifying that the storms reported in the area during the relevant timeframe actually passed over the Building.  Marshall does not have to prove Plaintiffs' entire case to assist the jury.  See City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 564–65 (11th Cir. 1998) ("As circumstantial evidence, McClave's data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury.").  Therefore, the Court finds that the conclusions contained in Marshall's report will assist the jury and are admissible.

### 4.   "Reasonably Capable" Opinion

Although Marshall may testify as to the conclusions listed in his report, the Court will exclude Marshall's testimony to the extent he seeks to testify that the winds on September 4, 2019, and February 6, 2020, "were reasonably capable of causing the damage" that Plaintiffs allege.  Marshall Dep. at 43–44.  This opinion is due to be excluded for a number of reasons.  First, this specific opinion is not in Marshall's report.  See Marshall Report at 10–11.  Rule 26

requires that an expert must include "a complete statement of all opinions the witness will express and the basis and reasons for them" in his report. See Rule 26(a)(2)(B)(i).    During his deposition, Marshall confirmed that the five conclusions listed in his report comprised all of the opinions he had in the case. See Marshall Dep. at 36.  Because Marshall did not include the "reasonably capable" opinion in his report, the Court will exclude it.  Second, Marshall expressed the opinion in response to a deposition question without identifying a reliable basis for it.  See Marshall Dep. at 43–47.  Although Plaintiffs argue that Marshall's experience and training support the opinion, see Plaintiffs' Response at 11, Marshall himself never explained "how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts." Frazier, 387 F.3d at 1265.

Third, the Court finds that the opinion would not assist the trier of fact because the phrase "reasonably capable" does not clarify the probability of damage.  In Frazier, a criminal defendant charged with kidnapping sought to introduce an expert witness who would testify that finding the defendant's hair and seminal fluid on the victim "would be expected" if the alleged events had occurred.  Id. at 1248, 1252.  The Eleventh Circuit concluded that the district court did not abuse its discretion in excluding the testimony because the witness did not have a reliable foundation for his opinion.  See id. at 1264–65.  In

addition, the circuit court found that the district court was within its discretion in concluding that the opinion would not be helpful to the jury:

> [B]ecause [the expert's] opinion was imprecise and unspecific, the members of the jury could not readily determine whether the "expectation" of finding hair or seminal fluid was a virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a possibility. As a result, [the expert's] imprecise opinion easily could serve to confuse the jury, and might well have misled it.

Id. Marshall's opinion here is similarly imprecise. Accordingly, the Court finds that Defendant's Motion is due to be denied, in part, and granted, in part. The Court will deny Defendant's Motion as to the conclusions stated in Marshall's report, but the Court will grant Defendant's Motion as to Marshall's opinion that the winds were "reasonably capable" of damaging a commercial building.

## B.   Quigley

Plaintiffs argue that the Court should exclude as unreliable Quigley's opinion that construction defects caused the water damage reported in the Building.[8]  Plaintiffs repeatedly contend that Quigley's opinions about construction defects are "mere speculation" and are "based on presumptions rather than fact."  Plaintiffs' Motion at 4, 7, 14.  Plaintiffs also argue that "Mr.

---

[8] Plaintiffs do not contest Quigley's qualifications or the fact that his testimony would assist the jury.  Indeed, the Court finds that Quigley is well-qualified to render his opinions by virtue of his education, training, and over forty years of experience as a structural engineer. See Quigley Report at 33–38 (Quigley's curriculum vitae).  In addition, his testimony would assist the jury because his opinions address a central issue in the case: Did wind create openings which resulted in water damage, or did something else allow water into the Building? See id. at 1.

Quigley testified that he is not qualified to provide a legal opinion regarding the cause of damage to Plaintiffs' property." Id. at 14.

In Defendant's Response, Defendant contends that Quigley used a reliable methodology by performing a water intrusion study to the extent possible, reviewing a prior water intrusion study, and analyzing documentation from Plaintiffs. See Defendant's Response at 9–10. Defendant argues that Quigley asserted a clear opinion in his report that construction defects caused the water intrusion. See id. at 5–9. Defendant further asserts that its answers to Plaintiffs' interrogatories reflect Quigley's belief that he formed and held a properly grounded opinion about the role of construction defects in the damage to Plaintiffs' property. See id. at 10–11. In addition, Defendant argues that Plaintiffs mischaracterize Quigley's answers to questions posed during his deposition. See id. at 11–14. Finally, Defendant contends that Plaintiffs can cross-examine Quigley concerning any perceived inconsistencies between his report and his deposition testimony. See id. at 2–3, 14–15.

As an initial matter, the Court finds that Quigley stated that he has an opinion about construction defects and is qualified to render such an opinion. In his report, Quigley stated that the "water intrusion at this building was due to problems with the construction of the building, including previous repairs, and was not due to wind caused openings in the building." Quigley Report at 1. Similarly, Quigley asserted that "[i]t is my opinion that water within this

building was caused by construction defects related to the window and door installation and the flashing and counter flashing system between the roof and the east and west walls." <u>Id.</u> at 29.  He maintained that "[t]hese opinions are based on my education, training, and experience and are to a reasonable degree of engineering certainty." <u>Id.</u> at 31.  Given these statements in the report, Plaintiffs' argument that Quigley himself does not believe that he has a reliable opinion about construction defects is unavailing.

Moreover, during his deposition, Quigley stated he is certain that construction defects caused at least some of the damage.  For example, the following passage demonstrates that Quigley formed an opinion regarding construction defects:

> Q: And while you evaluated construction defects, you've not formed an opinion with certainty that that's what caused the damage in this case; is that fair?
>
> A: Well, I'm certainly – I'm certain that there was a lot of water coming in through the windows, and that was most likely due to construction defects.  That's certainly what they repaired around the window.  They repaired the flashing around the window.  Kind of similar up at the roof intersection with the parapet, you know, it certainly looks like there were construction defects in that interface.

Plaintiffs' Motion, Ex. 2: Zoom Deposition of Kenneth R. Quigley (Doc. 36-2; Quigley Dep.) at 62–63.  At one point, Plaintiffs' lawyer asked Quigley, "But just what potential causes of loss do you think could have contributed to this claim?" <u>Id.</u> at 60.  Quigley responded, "I think there's obviously a construction

defect." Id.  Later in his deposition, Quigley categorized inadequate repairs and improper installation as aspects of his opinion about construction defects.  See id. at 69.  Contrary to Plaintiffs' characterization, Quigley never stated that his opinions about construction defects were merely speculation.  To the extent that Plaintiffs believe that Quigley contradicted himself in his deposition, Plaintiffs may cross-examine him concerning those alleged inconsistent statements.  See Quiet Tech. DC-8, 326 F.3d at 1341, 1345.

Plaintiffs are correct that Quigley stated that, if this case had involved a construction defect claim, he would have wanted to do more work.  See Plaintiffs' Motion at 8–9 (quoting Quigley Dep. at 62–63); Quigley Dep. at 38.  But the fact that Quigley would have wanted to do more if this had been a different case with a different claim does not mean that he did insufficient work in this case given the claim alleged by Plaintiffs and the available evidence.  He is confident that Plaintiffs' evidence shows water damage that is likely due to construction defects, not wind damage.  See Quigley Report at 1, 29, 31.  Quigley does not need to have absolute certainty for his opinion to be admissible.  See Jones, 861 F.2d at 662.

Notably, Plaintiffs do not identify anything specific about Quigley's methodology that is flawed.  Although Quigley could not perform a full inspection of the Building's damage and prior construction because Plaintiffs' contractor Jardy Group had already repaired the Building, see Quigley Report

at 11, the Court finds that Quigley used a reliable methodology to reach his opinions about construction defects.  Quigley noted the size, location, and surroundings of the Building.  See id. at 2, 11.  He reviewed Plaintiffs' production, including the photographs and reports of Plaintiffs' expert Ron Young of Jardy Group.  See id. at 2, 14–30.  He compared the photographs provided by Plaintiffs to "known engineering characteristics of wind, wind interfacing with buildings and their components, and water dispersion in buildings."  Id. at 11.  He consulted industry standards and guides, including the ASTM E2128 Standard Guide for Evaluating Water Leakage of Building Walls, the Brick Industry Association's Technical Notes on Brick Construction 28D "Brick Veneer/Concrete Masonry Walls," and the Dow Construction Sealants Technical Manual (Americas).  See id. at 11, 16, 24, 31–32.  Quigley compared what he could see of the Building's construction to local building codes.  See id. at 11; Quigley Dep. at 103.  He relied on his education, training, and experience.  See Quigley Report at 31.  Quigley considered a project proposal from 2013 in which Construction Management Consulting Group noted apparent water intrusion issues in the Building and proposed further investigation.  See id. at 11–12.  Quigley also reviewed weather records from NOAA and photographs from GoogleEarth.  See id. at 2.  Finally, Quigley visited the Building and corrected one minor aspect of his report based on what he saw.  See Quigley Dep. at 7–9.

In sum, Quigley's process included reviewing documentation from Plaintiffs; observing reported damage and the construction of the Building; comparing those observations to the building code, manufacturer's requirements, industry standards, and his experience; considering the history of the Building, including a previous proposal for a water intrusion study; gathering information about weather events that could have caused wind-created openings; and personally visiting the Building. This methodology is sufficiently reliable for the Court to admit Quigley's testimony. Indeed, district courts in this circuit have approved similar methodologies used by engineers who provided opinions about damage to buildings. See SFR Servs., 2021 WL 1193284, at *9 (approving the methodology of an engineer who considered "purportedly-pertinent NOAA data, his own visit to the home, his own roof inspection experience, knowledge, and training, and the three-second wind speed contour map"); St. Louis Condo. Ass'n v. Rockhill Ins. Co., No. 18-21365-Civ, 2019 WL 2013007, at *4 (S.D. Fla. Mar. 11, 2019) (finding reliable an engineer's methodology of reviewing meteorological data, making a visual inspection of the building, conducting measurements, opening doors and windows, observing physical evidence, consulting public records, and relying on thirty years of experience); Travelers Prop. Cas. Co. of Am. v. All-S. Subcontractors, Inc., No. CV 17-0041-WS-B, 2018 WL 1787884, at *7 (S.D. Ala. Apr. 13, 2018) ("[C]ourts have recognized that an engineer's use of techniques

of visual inspection, code review, and reliance on experience and expertise can satisfy the <u>Daubert</u> reliability prong.").  Although Quigley could not review the damage in person because the Building had already been repaired, he still employed a sufficiently reliable methodology under the circumstances.  <u>See Rahmings v. Essary</u>, No. 10-CV-716, 2012 WL 12910264, at *5 (M.D. Fla. Feb. 3, 2012) ("Mr. Medwell bases his decision about the condition of the brakes on his assessment of the damage to the brakes in accident photographs.  He could not inspect the brakes themselves as they were fixed after the accident.  Whether Mr. Medwell is credible on this point is for the jury to decide."); <u>Smith W. Tex. Props., Ltd. v. Allied Prop. & Cas. Ins. Co.</u>, No. MO:18-CV-137-DC, 2020 WL 5521137, at *3–4 (W.D. Tex. Aug. 21, 2020) (finding that an expert employed a reliable methodology by reviewing photographs of "suspected hail strikes at the properties" and comparing them to his own experience and to published photographs of typical hail damage).  For all of the foregoing reasons, after careful consideration of Quigley's report, his deposition testimony, and the other evidence of record, the Court finds that Quigley's opinion is reliable.  Thus, Plaintiffs' Motion is due to be denied.

## IV.  Conclusion

The Court finds that Plaintiffs' expert Marshall employed a reliable methodology and reached conclusions that will assist the trier of fact.  However, the Court will limit his testimony to the opinions expressed in his report.

Marshall may not testify that the wind events he identified were "reasonably capable" of causing damage to Plaintiffs' Building. The Court also finds that Defendant's expert Quigley used a reliable methodology in reaching his opinions about construction defects. Therefore, the Court will allow him to testify as to those opinions. Accordingly, it is

**ORDERED:**

1.  Defendant, Hartford Insurance Company of the Southeast's Motion to Strike Expert Testimony of Plaintiff's [sic] Expert Witness Timothy P. Marshall Under <u>Daubert</u> Standard and Memorandum of Law in Support Thereof (Doc. 35) is **GRANTED, in part**, and **DENIED, in part**.

    A.  The Motion is **GRANTED** to the extent that Marshall may not testify to opinions not included in his report.

    B.  In all other respects, the Motion is **DENIED**.

2.  Plaintiffs' <u>Daubert</u> Motion in Limine to Exclude Portions of Expert Testimony of Kenneth R. Quigley and Incorporated Memorandum of Law (Doc. 36) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida, on July 19, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

lc30
Copies to:

Counsel of Record